Joseph M. KEATING, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

State of California, ex rel. California State Water Resources Control Board, Intervenor.

No. 90–1080.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 31, 1991.

Decided March 8, 1991.

On Denial of Intervenor's Petition for Rehearing May 10, 1991.

Robin L. Rivett, with whom Ronald A. Zumbrun, Sacramento, Cal., was on the brief, for petitioner.

Joel M. Cockrell, Atty., F.E.R.C., with whom William S. Scherman, General Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent.

Roderick E. Walston, Supervising Deputy Atty. Gen., San Francisco, Cal., was on the brief, for intervenor. Clifford T. Lee, San Francisco, Cal., also entered an appearance, for intervenor.

Before MIKVA, Chief Judge, EDWARDS and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

618

HARRY T. EDWARDS, Circuit Judge:

The petitioner in this case, Joseph M. Keating, challenges a decision by the Federal Energy Regulatory Commission ("FERC") dismissing his application for a license to construct and operate a hydro-electric power plant. In rejecting the petitioner's license application, FERC ruled that Keating did not have the necessary state certification covering water quality standards for the project as required by the Clean Water Act. *See* 33 U.S.C. § 1341(a)(1) (1988).[1]

Keating contends that he obtained the requisite certification from the State of California in the course of procuring an earlier permit with respect to the same project from the Army Corps of Engineers ("the Corps"); the state, however, claims to have revoked that earlier certification. Keating now argues that, under the ex-press terms of 33 U.S.C. § 1341(a)(3) (1988),[2] California's purported revocation is invalid as a matter of federal law and that FERC is bound by the Clean Water Act to recognize the continuing validity of the state's earlier certification. In reply, FERC insists that it is powerless to apply the standards of section 1341(a)(3) and that Keating's only recourse for contesting the validity of California's asserted revocation is in the California state courts.

We can find no merit in FERC's position; we therefore grant the petition for review. We agree that section 1341(a)(3) of the Clean Water Act expressly controls the va-lidity of California's attempted withdrawal of its prior certification. Because this pro-vision requires an application of federal law, in connection with a matter that is within the clear compass of FERC's juris-diction, we hold that FERC is obligated to apply the controlling federal law in consid-

1. (1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any dis-charge into the navigable waters, shall pro-vide the licensing or permitting agency a cer-tification from the State in which the dis-charge originates or will originate, or, if ap-propriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the dis-charge originates or will originate, that any such discharge will comply with the applica-ble provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. In the case of any such activity for which there is not an applica-ble effluent limitation or other limitation un-der sections 1311(b) and 1312 of this title, and there is not an applicable standard under sec-tions 1316 and 1317 of this title, the State shall so certify, except that any such certifica-tion shall not be deemed to satisfy section 1371(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certi-fication by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administra-tor, as the case may be, fails or refuses to act on a request for certification, within a reason-able period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certifica-tion has been denied by the State, interstate agency, or the Administrator, as the case may be.

33 U.S.C. § 1341(a)(1) (1988).

2. (3) The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with re-spect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, agency, or Ad-ministrator, as the case may be, which shall be given by the Federal agency to whom ap-plication is made for such operating license or permit, the State, or if appropriate, the inter-state agency or the Administrator, notifies such agency within sixty days after receipt of such notice that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title be-cause of changes since the construction li-cense or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements. This paragraph shall be inap-plicable in any case where the applicant for such operating license or permit has failed to provide the certifying State, or, if appropriate, the interstate agency or the Administrator, with notice of any proposed changes in the construction or operation of the facility with respect to which a construction license or permit has been granted, which changes may result in violation of section 1311, 1312, 1313, 1316, or 1317 of this title.

33 U.S.C. § 1341(a)(3) (1988).

ering Keating's present request for a license. Accordingly, we remand the case to the agency with instructions to reinstate Keating's application and to consider whether California's attempted revocation is valid.

## I. BACKGROUND

Joseph Keating desires to build a small hydroelectric power plant, called the Tungstar project, on the Morgan and Upper Pine Creeks in Inyo County, California. Under section 4(e) of the Federal Power Act, Keating is required to obtain a license from FERC authorizing construction and operation of the proposed facility. *See* 16 U.S.C. § 797(e) (1988). Because construction of the plant would require the placement of dredged or fill material into the creeks, Keating was also required, by section 404 of the Clean Water Act, 33 U.S.C. § 1344 (1988), to obtain a dredge-and-fill permit from the Army Corps of Engineers.

The licensing authority of both FERC and the Corps, however, is contingent upon compliance with a provision of the Clean Water Act, section 401(a)(1), which requires prior state environmental approval of proposed water projects. *See* 33 U.S.C. § 1341(a)(1) (1988), *reprinted at* note 1 *supra.*

■ Both a section 4(e) (FERC) license and a section 404 (Corps) permit fall within the terms of "a Federal license or permit" subject to the state certification requirement under section 401. *See* 33 C.F.R. §§ 325.1(d)(4), 330.9(a), 336.1(a)(1), (b)(8) (1990) (Corps section 404 permit must be supported by section 401 state certification); 18 C.F.R. § 4.38(a) & (c)(2) (1990) (applicant for FERC license under section 4(e) must produce proof of section 401 certification or waiver); *City of Fredericksburg, Va. v. FERC,* 876 F.2d 1109, 1111 (4th Cir.1989) (section 4(e) license applicant must obtain state certification under section 401). Without such state certification, neither the FERC license nor the Corps permit may be issued. *See* 33 U.S.C. § 1341(a)(1) (1988) ("No [federal] license or permit shall be granted until the certification required by this section has been obtained or has been waived....").

On June 23, 1986, Keating filed a request for state certification of his proposed Tungstar project with the Lahontan Regional Water Quality Control Board ("the Regional Board"), a division of the California State Water Resources Control Board. Three months later, on September 30, 1986,

he submitted an application to FERC for a section 4(e) license.

■ While his applications before FERC and the California Regional Board were pending, Keating also sought a dredge-and-fill permit from the Army Corps of Engineers under section 404. The Corps authorizes dredge-and-fill operations in one of two ways: either with a permit that extends only to a given project, based upon a site-specific review of the particular activities proposed there; or, for certain classes of activities that "will cause only minimal adverse environmental effects," with a general permit, customarily known as a "nationwide permit." *See* 33 U.S.C. § 1344(e)(1) (1988); 33 C.F.R. Part 330 (1990). *See generally United States v. Marathon Dev. Corp.,* 867 F.2d 96 (1st Cir.1989). A nationwide permit authorizes any party to engage in the sort of activity described in the permit without the need to seek prior project-specific authorization. *See id.* at 98–99; *Riverside Irr. Dist. v. Andrews,* 758 F.2d 508, 511 (10th Cir.1985); *Orleans Audubon Soc'y v. Lee,* 742 F.2d 901, 909–10 (5th Cir.1984); *see also* 33 C.F.R. § 320.1(c) (1990) ("If an activity is covered by a general permit, an application for a ... [Corps] permit does not have to be made. In such cases, a person must only comply with the conditions contained in the general permit to satisfy requirements of law for a ... [Corps] permit.").

Regardless of which route is followed, however, the Corps cannot issue a permit under section 404 without first obtaining state certification pursuant to section 401 from the state in which the activity is to take place. *See* 33 C.F.R. §§ 330.9(a), 336.1(b)(8) (1990); *Marathon Development,* 867 F.2d at 100 ("[T]he state certification requirement of section 401 applies to section 404(e) nationwide permits in the same way that it applies to any other section 404 permit."); *Friends of the Earth v. United States Navy,* 841 F.2d 927, 929–30 (9th Cir.1988). At about the same time that Keating was seeking a site-specific state certification for his Tungstar project, the Corps sought state certification in connection with 26 nationwide permits covering a range of modest construction, navigational and similar activities. *See* 33 C.F.R. § 330.5 (1990) (listing nationwide permits). On October 31, 1986, the California State Water Resources Control Board ("the State Board")—the parent agency of the Regional Board then considering Keating's project—granted a blanket state certifica-

tion authorizing the activities set out in all 26 Corps nationwide permits. *See* State Water Resources Control Board, 1986 Amended Decision (Oct. 31, 1986), *reprinted in* Appendix ("App.") Tab 3. The State Board's certification included a number of conditions concerning particular regions in the state, none of which were relevant to Keating's project, and claimed to reserve "discretionary authority to revoke certification, or set additional conditions of certification, for such permits on a case-by-case basis." *Id.* Based on this certification, the Corps issued final permits on January 12, 1987.

Keating's Tungstar project is covered by the last of the general permits issued by the Corps. On October 11, 1987, Keating wrote to the Los Angeles District of the Corps, seeking confirmation that his proposed Tungstar project fell within the scope of the nationwide permit. On November 18, 1987, the Corps replied, agreeing that Keating's project was authorized by the Corps' Nationwide Permit No. 26. *See* Letter from Clifford Rader, U.S. Army Corps of Engineers, to Joseph Keating (Nov. 18, 1987) (citing 33 C.F.R. § 330.-5(a)(26) (Nationwide Permit No. 26)), *reprinted in* App. Tab 7. "As long as you comply with the nationwide permit conditions," the Corps letter stated, "an individual permit is not required." *Id.* (citation omitted).

■ Although it is undisputed that Keating had a Corps section 404 permit for his project, and that this permit was granted with the requisite state certification, he nonetheless ran into difficulties in connection with his application for a section 4(e) license from FERC. Under section 401(a)(3) of the Clean Water Act, absent other valid objections, FERC was obliged to accept the certification underlying the Corps permit as satisfying the state certification requirement with respect to Keating's section 4(e) license application. *See* 33 U.S.C. § 1341(a)(3) (1988). However, on April 30, 1987, the California Regional Board, which had continued to review Keating's application for certification specific to the Tungstar site, denied Keating's request without prejudice because Keating allegedly had failed to submit all environmental documentation required by state law. *See* Letter from James L. Easton, Exec. Dir., State Water Resources Control Board, to Joseph M. Keating (Apr. 30, 1987), *reprinted in* App. Tab 4. Upon learning of this situation, officials at FERC apparently believed that they were faced with conflicting

signals from the State of California concerning whether Keating had the requisite state certification to support his section 4(e) license application. On the one hand, the State Board had certified that projects satisfying the criteria spelled out in the Corps' Nationwide Permit No. 26 would conform with state water quality standards, and the Corps had subsequently confirmed that Keating's project fell within the scope of that permit. On the other hand, the Regional Board had later denied Keating's site-specific request for certification on grounds of inadequate environmental data.

In light of these arguably inconsistent pronouncements, FERC sought clarification from the State of California regarding certification of the Tungstar project. Specifically, FERC asked the State Board whether the Regional Board's project-specific denial of certification for the Tungstar project in April 1987 purported to revoke the State Board's October 1986 blanket certification of projects, like Keating's, satisfying the Corps' nationwide permit criteria. *See Joseph Martin Keating,* 45 F.E.R.C. (CCH) ¶ 61,112, at 61,351 (Oct. 27, 1988) (order on motion for expedited action on license application), *reprinted in* App. 10. The State Board responded on December 9, 1988, confirming that the Regional Board's action vitiated the state's earlier certification given in connection with the Corps nationwide permits. The State Board explained that it had never intended by its blanket Corps certification to certify any individual projects for purposes of a later federal power license and that if "certification of Nationwide Permits applies to applications for hydropower licenses under the Federal Power Act, that certification was revoked as applied to the Tungstar project." *See* California State Water Resources Control Board Response to Request for Advice Regarding the Status of State Water Quality Certification Under Section 401 of the Clean Water Act for the Tungstar Project 3 (Dec. 9, 1988), *reprinted in* App. Tab 11.

On the basis of the state's reply, FERC held itself powerless to act on Keating's application. "In light of the Board's December 12, 1988[,] filing," FERC wrote, "it has not been shown that the Tungstar Project has water quality certification." *See Joseph Martin Keating,* 47 F.E.R.C. (CCH) ¶ 61,170, at 61,554 (May 2, 1989) (order denying motion for expedited action on license application), *reprinted in* App. Tab 1. Accordingly, the agency suspended

consideration of Keating's license application until Keating could produce an unclouded state certification. *Id.*

In his petition for rehearing, Keating objected vigorously to FERC's acceptance of California's decision to revoke the certification Keating claimed to hold under the state's 1986 blanket approval of the Corps' nationwide permits. Keating argued that section 401(a)(3) of the Clean Water Act, 33 U.S.C. § 1341(a)(3) (1988), limits the power of a state to revoke a prior certification once a federal license or permit—such as a Corps section 404 permit—has been issued on the basis of that certification. California's attempted revocation, Keating continued, was invalid by the terms of that federal law and FERC was therefore obligated to treat California's original certification of his project as valid for purposes of his subsequent section 4(e) license application.

In reply, FERC refused Keating's demand that it review the validity of California's purported revocation. The agency contended that "[a] review of the case law on section 401 of [the Clean Water Act] ... indicates that the issue of whether a state certifying agency has legally revoked validly issued project-specific or blanket water quality certification is reviewable in the state courts, not by this Commission." *See Joseph Martin Keating,* 49 F.E.R.C. (CCH) ¶ 61,343, at 62,229 (Dec. 18, 1989) (order denying rehearing) (*"Rehearing Order"*), *reprinted in* App. Tab 2. The Commission acknowledged Keating's argument that federal law governed the validity of California's action, but held nonetheless that Keating's *only* recourse was a challenge in the state courts. As the Commission later explained in response to Keating's arguments concerning the controlling effect of section 401(a)(3) of the Clean Water Act, "whatever may be the validity of these contentions, the Commission's position here is that they must be raised and decided by the state agency and thereafter, if necessary, reviewed in state court." *See* Brief for Respondent Federal Energy Regulatory Commission at 21, *Keating v. FERC,* No. 90–1080 (D.C.Cir. Mar. 8, 1991).

Because Keating refused to pursue any such state remedies, FERC dismissed his license application. *See Rehearing Order,* 49 F.E.R.C. at 62,231. Keating then filed this petition for judicial review.

## II. ANALYSIS

### A. *This Court's Authority and the Issue on Appeal*

In section 4(e) of the Federal Power Act, Congress delegated to the Federal Power Commission, now the Federal Energy Regulatory Commission, the authority to issue licenses for the construction and operation of hydroelectric facilities. 16 U.S.C. § 797(e) (1988). We have jurisdiction to review FERC's final order dismissing Keating's application under section 313(b) of the Federal Power Act. 16 U.S.C. § 825*l*(b) (1988).

The dispute between Keating and the Commission is relatively narrow: whether the blanket certification issued by California in October 1986 continues in effect for Keating's Tungstar project or whether California's claimed revocation of that approval in April 1987 effectively blocks the issuance of the FERC license. It is clear on these facts that the resolution of this dispute is controlled by a provision of federal law, section 401(a)(3) of the Clean Water Act. The only question remaining is who must apply that provision—FERC or the state courts.

At first blush, the record in this case suggested that state and federal authorities had overlapping, and seemingly conflicting, authority in connection with Keating's section 4(e) license application. Thus, it appeared that this case might pose an impossible dilemma with respect to the jurisdiction of federal and state agencies to enforce the Clean Water Act. Upon careful consideration, however, the facts at hand are relatively straightforward and the applicable legal standards are not unclear.

At bottom, this case strictly concerns an application of section 401(a)(3) of the Clean Water Act. *See* note 2 *supra.* The Army Corps of Engineers first received state certification under section 401 for its section 404(e) nationwide permits. The Corps then issued permits, one of which covered Keating's project. The Corps deemed the state certification underlying its permits to be final and unqualified, at least insofar as Keating's project was concerned. *See* note 4 *infra.* Thus, the state certification underlying the Corps permit should have been sufficient under section 401(a)(3) to support Keating's application for a section 4(e) license from FERC. Under section 401(a)(3), the only way that FERC could reject the prior certification as

insufficient to support the section 4(e) license application was upon a finding that the State of California, within 60 days after proper notice, gave notice to FERC that there was "no longer reasonable assurance that [Keating would comply with the applicable water quality standards] ... because of *changes* since the [issuance of California's 1986 blanket certification] ... in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements." 33 U.S.C. § 1341(a)(3) (1988). In other words, a state may revoke a prior certification that might otherwise support a subsequent license application, but only pursuant to the terms of, and for the reasons indicated in, section 401(a)(3).

Thus, this case boils down to an analysis of whether FERC was justified in refusing to recognize the state certification underlying the Corps permit as valid and sufficient for purposes of Keating's subsequent application for a section 4(e) license. Stated alternatively, the question before us focuses on FERC's authority to decide whether the state's purported revocation of its prior certification satisfied the terms of section 401(a)(3). We have no doubt that the question posed is a matter of federal law, and that it is one for FERC to decide in the first instance.

B. *The Statutory Framework*

In designing the Clean Water Act, Congress plainly intended an integration of both state and federal authority. Although federal licenses are required for most activities that will affect water quality, an applicant for such a license must first obtain state approval of the proposed project. *See* 33 U.S.C. § 1341(a)(1) (1988). The states remain, under the Clean Water Act, the "prime bulwark in the effort to abate water pollution," *see United States v. Puerto Rico*, 721 F.2d 832, 838 (1st Cir.1983), and Congress expressly empowered them to impose and enforce water quality standards that are more stringent than those required by federal law, *see* 33 U.S.C. § 1370 (1988). At the very outset of the statute, Congress made clear that

> [i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use ... of land and water resources, and to consult

with the Administrator in the exercise of his authority under this chapter.

33 U.S.C. § 1251(b) (1988).

One of the primary mechanisms through which the states may assert the broad authority reserved to them is the certification requirement set out in section 401 of the Act. Section (a)(1) of that provision says that no federal license or permit may be granted in the absence of the requisite state certification indicating that no state water quality standards will be violated by the proposed project. *See* 33 U.S.C. § 1341(a)(1) (1988). Through this requirement, Congress intended that the states would retain the power to block, for environmental reasons, local water projects that might otherwise win federal approval. *See Marathon Development*, 867 F.2d at 99–100; 2 W. RODGERS, JR., ENVIRONMENTAL LAW: AIR AND WATER § 4.2, at 26 (1986) ("Section 401 offers a veto power to states with water quality related concerns about licensing activities of the various federal agencies, including the Environmental Protection Agency, Federal Energy Regulatory Commission, Corps of Engineers, and the Nuclear Regulatory Commission.").

■ There is no doubting that FERC is bound by federal law to refuse a section 4(e) license application that is unsupported by a valid state certification under section 401. *See* 33 U.S.C. § 1341(a)(1) (1988); *City of Fredericksburg*, 876 F.2d at 1111. Nor do we doubt the propriety of a federal agency's refusal to review the validity of a state's decision to grant or deny a request for certification in the first instance, before any federal license or permit has yet been issued. Such a decision presumably turns on questions of substantive state environmental law—an area that Congress expressly intended to reserve to the states and concerning which federal agencies have little competence. It is for these reasons that a number of courts have held that disputes over such matters, *at least so long as they precede the issuance of any federal license or permit,* are properly left to the states themselves. *See Marathon Development*, 867 F.2d at 102; *Proffitt v. Rohm & Haas*, 850 F.2d 1007, 1009 (3d Cir.1988) (dictum); *Roosevelt Campobello Int'l Park Comm'n v. EPA*, 684 F.2d 1041, 1056 (1st Cir.1982); *Lake Erie Alliance for the Protection of the Coastal Corridor v. United States Army Corps of Eng'rs*, 526 F.Supp. 1063, 1074 (W.D.Pa.1981), *aff'd mem.*, 707 F.2d 1392 (3d Cir.), *cert. denied*, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257

(1983); *Mobil Oil Corp. v. Kelley*, 426 F.Supp. 230, 234–36 (S.D.Ala.1976).

██ The certification power of the states, under section 401 is not, however, unbounded. Whatever freedom the states may have to impose their own substantive policies in reaching initial certification decisions, the picture changes dramatically once that decision has been made and a federal agency has acted upon it. Thus, under section (a)(3) of section 401, Congress created a presumption that a state certification issued for purposes of a federal construction permit will be valid for purposes of a second federal license related to the operation of the same facility.[3] A state may overcome that presumption and revoke certification for purposes of the second federal license, but only under limited circumstances expressly defined in the statute. *See* note 2 *supra.*

## C. *Keating's Case*

██ As indicated above, it is obvious that section 401(a)(3) controls the disposition of this case. The Commission did not doubt that a valid state certification had been granted by California for activities covered by the Corps' nationwide permits. Nor can it be doubted, given that section 401 certification is a predicate to the issuance of any section 404 permit, and that a Corps dredge-and-fill permit *is* a federal permit "with respect to the construction of a[ ] facility" within the meaning of section 401(a)(3). It is also significant that the Commission made an express finding that a "Corps section 404 permit for the Tungstar Project [had] ... issued and [was] ... final," *see Rehearing Order*, 49 F.E.R.C. at 62,230, a conclusion that has been reinforced by the Corps itself.[4] From these facts, it is clear that section 401(a)(3) governs the validity of California's attempt, after a valid Corps section 404 permit had issued, to revoke its prior certification for purposes of Keating's second federal license application.

██ The arguably equivocal language used in California's section 401 certification to the Corps does not require a contrary result. We recognize the authority of states to impose express conditions upon the issuance of a particular certification. When states make compliance with specified conditions a prerequisite to the effectiveness of a certification, the federal Government has been prepared to enforce those conditions. *See Roosevelt Campobello*, 684 F.2d at 1055–57; 33 U.S.C. § 1341(d) (1988); 33 C.F.R. §§ 325.4(a)(1), 330.9(a) (1990) (Corps section 404 permits will incorporate conditions specified by states in underlying section 401 certifications). In this case, however, we are confronted not by any such conditions precedent, but rather by the state's claim of a general reservation of discretionary authority to revoke prior blanket certification as to particular projects at any time and apparently for any reason. Such a broad reservation of authority cannot be squared with Congress' purpose in section 401(a)(3). The statute allows a state to revoke a prior certification only within a specified time limit and only pursuant to certain defined circumstances; if a state could revoke a prior certification at any time and for any (or no) reason, however, section 401(a)(3) would be rendered meaningless. Obviously, such a result would make no sense.

It is the applicability of section 401(a)(3) that separates this case from those relied upon by FERC in asserting that the validity of a state's action in connection with certification is a question exclusively for the state courts. It is true that some of those cases suggested broadly that "certification under Section 401 is set up as an exclusive p[r]erogative of the state and is not to be reviewed by ... any agency of the federal government." *See Mobil Oil*, 426 F.Supp. at 234. But, to our knowledge, none of those cases involved a situation in which a state sought to revoke certification after a federal agency had already issued a

---

**3.** The applicable portion of section 401(a)(3) provides:

The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, [specified changed circumstances are present]....

33 U.S.C. § 1341(a)(3) (1988).

**4.** Corps officials have indicated that the nationwide permit issued under section 404 remains valid for purposes of Keating's project despite California's attempted revocation of the certification underlying it. *See* Letter from B.N. Goode, Chief, Regulatory Branch, U.S. Army Corps of Engineers, to John H. Tait (Mar. 10, 1989) ("If a state 'decertifies' a general or individual *permit after the Corps has issued the* permit in good faith reliance on the original certification, the Corps does not recognize an obligation to revoke the Corps permit but may elect to modify or revoke the permit at its own discretion...."), *reprinted in* App. Tab 13.

permit based upon the state's earlier approval—*i.e.*, the scenario contemplated by section 401(a)(3). In *Mobil Oil*, for instance, upon which FERC relies heavily, a state agency granted section 401(a)(1) certification to a project for purposes of a Corps of Engineers drilling permit and then revoked that certification *before* the Corps had acted upon the application. Because no federal permit had yet been issued, section 401(a)(3) had no application and the court found no federal law purporting to control the state's action. The court's decision in that context to abstain from intervening in the state's certification decision in no way suggests, however, that this court should follow suit, given that a Corps permit has already issued in Keating's case and that section 401(a)(3) clearly applies.

## D. *Applying Section 401(a)(3)*

As we have suggested, section 401(a)(3) permits state revocation of prior certification only if certain conditions are met. The first is timeliness: the state must notify the relevant federal licensing agency of its intention to revoke within 60 days of the time it is itself notified that a new license application is pending. The second is that the revocation be driven by some change in circumstances "since the construction license or permit certification was issued." *See* 33 U.S.C. § 1341(a)(3) (1988). If either of these conditions is not met—if the state's decision comes too late or if it is not pursuant to changed circumstances—then the attempted revocation is invalid as a matter of federal law and no further inquiry is needed.

▮▮▮▮▮ There can be no serious claim that FERC is without *any* authority to consider the validity of a state's purported revocation of a prior certification under section 401(a)(3). At a minimum, FERC must find that the purported revocation is timely and that the state's action was assertedly taken in response to *changed circumstances* pursuant to section 401(a)(3). In this case, there is no claim that the state's objection to FERC was untimely,[5]

but neither is there any suggestion that the state's purported revocation came "because of *changes* since the [Corps] ... permit certification was issued." 33 U.S.C. § 1341(a)(3) (1988) (emphasis added). This is a matter that FERC must consider on remand.

If FERC finds that the state's revocation was both timely and assertedly because of changed circumstances, then the question will arise whether the motivating change in circumstance falls within one of the four categories specified in section 401(a)(3).[6] FERC has suggested, without any good explanation, that Keating's sole recourse for resolution of this question is before a state agency or a state court. We recognize that, in certain cases, the resolution of a disputed claim over "changed circumstances" under section 401(a)(3) may involve a question of state law or an application of state water quality standards, neither of which is within the expertise or normal jurisdiction of FERC. In such a situation, we could hardly doubt the wisdom of FERC'S declination of jurisdiction to resolve the section 401(a)(3) question. However, other cases might arise regarding claims of "changed circumstances" under section 401(a)(3) that easily can be resolved by FERC, without resort to consideration of state law or the applicable water quality standards.

FERC has been too quick to assume that it has no role to play in the application of section 401(a)(3). It is true that the state, alone, decides whether to certify under section 401(a)(1). The issue under section 401(a)(3), however, involves a different question, *i.e.*, one going to the authority of a *federal* agency to issue a *federal* permit or license once the state has already issued a certification. A state can affect federal authority under section 401(a)(3) only to the extent therein indicated. Thus, the application of section 401(a)(3) involves a federal question that, absent satisfactory explanation, presumably must be resolved by the applicable federal licensing authority and the federal courts. *Cf. New Orleans Pub.*

---

5. In fact, it is unclear whether the state was ever given the official federal notice that is contemplated under section 401(a)(3). The 60–day time limit for state objection set out in that section is not triggered until the state receives notice from the second federal licensing authority that there is a pending license application premised upon the state's earlier certification. Thus, in assessing the timeliness of California's asserted revocation on remand, FERC must first determine whether and when it notified the

state of Keating's section 4(e) license application.

6. The motivating change in circumstances must be related to:
(A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements.
33 U.S.C. § 1341(a)(3) (1988).

*Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 2512–13, 105 L.Ed.2d 298 (1989) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. . . . [T]he courts of the United States are bound to proceed to judgment and to afford redress to suitors before them in every case to which their jurisdiction extends. They cannot abdicate their authority or duty in any case in favor of another jurisdiction.") (inner quotation marks and citations omitted).

In any event, FERC has given no adequate explanation in this case for its refusal to apply section 401(a)(3). We offer no final judgment on this question, save to say that FERC must at least decide whether the state's assertion of revocation satisfies section 401(a)(3)'s predicate requirements—*i.e.,* whether it is timely and motivated by some change in circumstances after the certification was issued. Beyond that, assuming the predicate requirements are met, we do not decide whether FERC must go on to determine whether the asserted changed circumstance falls within one of section 401(a)(3)'s enumerated categories. FERC must, however, either decide the question itself or articulate a satisfactory explanation for why Congress would have intended to leave the application of some or all of section 401(a)(3)'s categorical provisions to the state courts alone.

### III. CONCLUSION

For the foregoing reasons, the petition for review is granted and the case is remanded to the Commission for further proceedings.

*So ordered.*

On Intervenor's Petition for Rehearing

May 10, 1991.

PER CURIAM:

■■■ Upon consideration of the petition for rehearing filed by intervenor, the State of California, it is hereby ordered that the petition is denied. We find no merit in this petition, and only one of the arguments raised warrants a response.

California now argues, for the first time, that section 401(a)(3) of the Clean Water Act, 33 U.S.C. § 1341(a)(3) (1988)—the statutory provision found to be controlling in this case—has no application here because the so-called dredge-and-fill permit issued to Keating by the Army Corps of Engineers ("the Corps") is not a permit "with respect to the construction of a[ ] facility" within the meaning of the statute. This argument comes too late, for it presents an entirely new theory of this case which cannot be appropriately raised on a petition for rehearing.

As was noted in the panel opinion in this case, section 401(a)(3) "create[s] a presumption that a state certification issued for purposes of a federal construction permit will be valid for purposes of a second federal license related to the operation of the same facility." *Keating v. FERC,* 927 F.2d 616, 623 (D.C.Cir.1991) (footnote omitted). Throughout this litigation, it has been Keating's contention that because he had earlier obtained state certification for a dredge-and-fill permit from the Corps—a permit that Keating needed in order to begin construction work at his proposed hydroelectric facility—section 401(a)(3) mandated that this certification would also be valid for purposes of obtaining a subsequent license from the Federal Energy Regulatory Commission ("FERC").[1]

During the proceedings before the agency, in their original briefs and at oral argument before this court, neither FERC nor California ever disputed Keating's assertion that a Corps dredge-and-fill permit is one for which state certification is required under 401(a)(1), and that such a permit is a "construction" permit within the contemplation of section 401(a)(3). For purposes of this litigation, we accepted these assertions as given. Both FERC and California limited their arguments principally to a claim that state courts have exclusive jurisdiction to review all disputes over state certifications under section 401(a)(1). It was not until the instant petition for rehearing that California raised for the first time a claim that the Corps permit is not a permit "with respect to the construction of a[ ] facility" within the meaning of the stat-

---

1. California does not dispute that the FERC license for which Keating applied is one "required for the operation of [Keating's proposed] . . . facility" within the meaming of section 401(a)(3). In fact, in its original brief before this court, California noted that "Keating [had] applied to [FERC] . . . for a license *to operate* the Tungstar hydropower project." Brief for Intervenor State of California at 3 (emphasis added).

ute. Because California failed to raise this argument until its petition for rehearing, the argument is waived and we decline to reopen the matter now.

We offer no view on whether, upon proper submission and review, it might be found that a Corps permit is not a "construction" permit within the contemplation of section 401(a)(3). Nothing in our decisions should be read to foreclose any party from raising this issue as may be appropriate in future litigation.